# United States Court of Appeals
## For the First Circuit

No. 05-1826

UNITED STATES OF AMERICA,

Appellee,

v.

DUCAN FANFAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before
Boudin, Chief Judge,
Torruella, Circuit Judge,
and Schwarzer,[*] District Judge.

Rosemary Curran Scapicchio for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

November 8, 2006

---

[*]Of the Northern District of California, sitting by designation.

**BOUDIN**, **Chief Judge**.  The complicated journey of this criminal case began with the indictment of Ducan Fanfan in 2003 on one count of conspiring to distribute and to possess with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846 (2000).  In a two-day trial conducted in October 2003, a jury convicted Fanfan, who was thereafter sentenced by the trial judge in June 2004 to 78 months in prison.

The sentence was well under the guideline level for the amount of drugs attributed to Fanfan because the district judge, acting in the period before United States v. Booker, 543 U.S. 220 (2005), deemed himself limited by Blakely v. Washington, 542 U.S. 296 (2004), to the 500 gram figure contained in the indictment and the jury's verdict.  On the government's appeal, the Supreme Court reviewed the district court decision, and in concert with its Booker decision, the Court then remanded Fanfan's case for resentencing.  Booker, 543 U.S. at 267.

The district judge resentenced Fanfan in May 2005 to 210 months in prison, treating the guidelines as advisory but ultimately sentencing Fanfan within the guideline range that the court found applicable.  Fanfan now appeals, arguing that both his conviction and the resentencing were flawed.  We begin with challenges to the conviction, then move to the sentence.

Fanfan's principal claim of error addressed to his conviction is that certain evidence should not have been admitted.

The contested evidence includes both out-of-court statements of co-defendants and actions of Fanfan occurring after the main co-conspirators (but not Fanfan himself) had been arrested.  To understand the evidence and its role requires considerable background.

The indictment against Fanfan charged him with conspiring from September 2002 to April 2003.  The co-conspirators included Vaughan Smith, Joe Ash, and Donovan Thomas, all of whom testified for the government as part of plea agreements.  With corroborating detail, Thomas testified that starting in the summer of 2002 he regularly purchased cocaine from Fanfan, who was based in Massachusetts, and supplied it to Ash.  Ash testified that he supplied it to Smith, who was based in Maine.  Ash also testified that his sister and girlfriend sometimes made pick-ups from Thomas.

Both Smith and Ash described their own roles and actions in terms consistent with Thomas' testimony, but neither of them dealt directly with Fanfan or could testify to his role.  The closest connection Ash had to Fanfan was when Thomas told Ash that "his man" had a car to sell.  Ash gave Thomas $10,000 cash for the vehicle.  Fanfan accompanied Thomas when Thomas delivered the Lexus to Ash, and Ash identified Fanfan at the trial as the man from whom he purchased the car.

In late March 2003, agents arrested Smith, finding money and drugs in his home, and on April 2, Smith arranged a controlled

purchase from Ash, who was in turn arrested the next day with drugs. Thomas was arrested later that same day when he traveled to Maine to collect payment from Ash. At trial the government was prepared to treat Thomas' arrest as terminating the conspiracy. This is not necessarily so but, given the concession, we follow the district court in treating what happened after Thomas' arrest as post-conspiracy events.

Under arrest, Thomas made statements to the police identifying Fanfan and admitting that he had been distributing drugs for Fanfan since the summer of 2002. Thomas then paged Fanfan, with the government recording the call, and ordered a kilogram of cocaine and four and a half ounces of crack cocaine. Thereafter, Thomas met Fanfan by prearrangement; Fanfan was arrested, and police seized from his car 1.247 kilograms of cocaine and 281.6 grams of cocaine base.

At trial, Thomas testified to the events just described and tapes were played of the post-arrest conversations between Thomas and Fanfan recording the ordering of the drugs and the rendezvous arrangements between the two of them. The government also offered the seized drugs in evidence. The district court admitted all of the evidence but with a limiting instruction as to out-of-court statements made by Thomas after his arrest.

In substance, the district court told the jury that anything said by Thomas, out of court and after his arrest, could

not be considered for its truth but only to provide context for the jury's understanding of Fanfan's statements and actions; Fanfan's own statements, of course, were party admissions not subject to a hearsay objection, but the communications between Thomas and Fanfan were cryptic, as is commonly the case in drug dealing.  The district court also told the jury not to consider the evidence of events occurring post-conspiracy as evidence of any other crime, but only as evidence to prove the charged conspiracy.

Fanfan first argues that the evidence of a major drug transaction after the charged conspiracy had ended was "bad act" evidence of conduct not itself part of the charged crime.  Such evidence is not admissible to show criminal propensity and must have some other legitimate purpose (such as showing identity or plan), Fed. R. Evid. 404(b); and, in addition, the evidence must be excluded if unfair prejudice substantially outweighs the probative value of the evidence.  Fed. R. Evid. 403.

We will assume that these objections were properly preserved, as it does not affect the outcome.  The evidence of this final transaction was undoubtedly potent: although Thomas' own in-court testimony of his pre-arrest drug dealing with Fanfan amply supported Fanfan's conviction, Thomas was the only one who could squarely identify Fanfan as the man who supplied the rest of the chain.  And since Thomas had a plea deal with the government and a prior record, his in-court testimony was subject to impeachment.

The final, post-conspiracy transaction, in which Fanfan was seized with drugs corresponding to Thomas' order, not only bore out Thomas' earlier testimony but provided vivid evidence of Fanfan's criminal endeavor.

However, this final transaction was not just some random drug crime by Fanfan from which could be inferred a propensity on his part to commit drug crimes and from which, in turn, a jury could infer that he engaged in the earlier conspiracy charged in this case. Here, the post-conspiracy crime was close in time to the conspiracy as described by Thomas; the procedure used to contact Fanfan and order the drugs corresponded to Thomas' description of the conspiracy; and Fanfan's appearance at the rendezvous with the drugs order completed the equation.

Thus, even if not part of the conspiracy because (unknown to Fanfan) the conspiracy had ended, the final transaction evidenced the modus operandi by which the conspiracy was carried out, which in turn answered the question of the identity of the lead perpetrator--a purpose for which bad act evidence is allowed. Fed. R. Evid. 404(b). The case law in this circuit and elsewhere supports the view that modus operandi evidence can be admitted to prove identity, despite Fanfan's attempt to distinguish some of the cases on their facts.[1]

---

[1] E.g., United States v. Trenkler, 61 F.3d 45, 52 (1st Cir. 1995); United States v. Williams, 985 F.2d 634, 637 (1st Cir. 1993); United States v. Perry, 438 F.3d 642, 648 (6th Cir.), cert.

As for Rule 403, the disputed evidence was highly probative. The final transaction was an integral part of a prior pattern of behavior described by Thomas and, but for his arrest, would have been part of the conspiracy between Fanfan and others in the chain. It was not inflammatory evidence--just a vivid depiction mirroring prior events to which Thomas could properly testify. See United States v. Procopio, 88 F.3d 21, 30 (1st Cir. 1996). The risk that the jury would overvalue or misuse the evidence was minimal.

Both the Rule 403 and the Rule 404 issues, as presented in this case, involved judgment calls as to the application of clear rules to clear facts. On such application-of-law judgments, the district judge enjoys considerable latitude and will be overturned only for abuse of discretion. Trenkler, 61 F.3d at 52. In this case, the district court was not only within its discretion but also clearly right in admitting the evidence.

Turning to a related but different claim of error, Fanfan argues that the limiting instruction as to the use of this bad act evidence was insufficient. The judge did caution the jury that it could consider the post-arrest transaction only to assist it in deciding whether the pre-arrest conspiracy had occurred and that it could convict only for the conspiracy charged in the indictment and

---

denied, 126 S. Ct. 2045 (2006); United States v. Anifowoshe, 307 F.3d 643, 647 (7th Cir. 2002); United States v. Sanchez, 988 F.2d 1384, 1393-94 (5th Cir.), cert. denied, 510 U.S. 878 (1993).

not for any other crime.  Fanfan says that the jury should also have been told not to draw the "propensity" inference.

So far as we can tell, Fanfan made no request for such an instruction; while Fanfan maintains that he objected to the instruction, the government disagrees and we search in vain for evidence in the transcript of an objection.  That is hardly surprising: many defense lawyers would shrink from an instruction that the jury should not count Fanfan's propensity for drug dealing against him.  Rather than erasing the risk that the jury would misuse the bad act evidence, such an instruction could easily invite the jury's attention to a quite natural inference.

Even had there been an objection, the absence of a "propensity" instruction <u>in this case</u> could not conceivably have affected the outcome of the trial and so would be harmless error, if it were error at all.  <u>United States</u> v. <u>Olano</u>, 507 U.S. 725, 734 (1993); <u>United States</u> v. <u>Castellini</u>, 392 F.3d 35, 52 (1st Cir. 2004).  The permissible inference from the objected-to evidence in this case lay on top of, but was far more powerful than, mere propensity evidence:  it strongly suggested that Fanfan was <u>continuing the same course of conduct that comprised the conspiracy</u>.

In a final brief challenge to the conviction, Fanfan says that his constitutional right to a jury trial was trammeled because the verdict form, after first asking for a general verdict of

guilty or not guilty, added a contingent special interrogatory. The interrogatory said that, if the jury convicted, it should then determine whether the conspiracy encompassed 500 grams or more of cocaine.

The question was asked because <u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466 (2000), required a jury determination of 500 or more grams in order to increase the statutory maximum penalty from 20 years to 40 years. <u>Compare</u> 21 U.S.C. § 841(b)(1)(B), <u>with</u> <u>id.</u> § 841(b)(1)(C). Furthermore, at the time, it was uncertain whether the Supreme Court was moving toward a requirement that guideline enhancements, even within the statutory maximum, be based on jury findings--a course <u>Booker</u> rejected by only a single vote after Fanfan's conviction.

In some situations, special interrogatories or special verdicts pose risks in criminal cases; for example, they can be asked in a form that suggests through progressive steps a particular outcome. <u>United States</u> v. <u>Spock</u>, 416 F.2d 165, 182 (1st Cir. 1969). But we have not adopted any flat prohibition, and this special interrogatory posed no such risk and had a permissible purpose. There was no error, let alone plain error.

Fanfan's remaining arguments concern the sentence. As background we note that, at the original sentencing in June 2004, the district judge had, on a precautionary basis, made the ordinary guideline calculations; only then did the judge eliminate upward

adjustments, other than the 500 gram determination, because he assumed that Blakely would be held to require jury findings based on proof beyond a reasonable doubt as to guideline enhancements, including drug quantity and relevant conduct.

The Supreme Court, of course, rejected this requirement in Booker and remanded Fanfan's case for resentencing. Booker, 543 U.S. at 245, 267. On remand, the district court declined to reexamine the factual determinations it had made at the first sentencing to compute the guideline range; but the judge did consider the computed guideline range as advisory and took note of the statutory section 3553(a) factors as well. The result was a sentence of 210 months, which is in the middle of the calculated guideline range.

The numerous claims of sentencing error pressed on appeal fall into several different categories. At the threshold, Fanfan says that no resentencing should have been allowed. But the Supreme Court expressly held that the government could seek resentencing of Fanfan under the new post-Booker sentencing regime, id. at 267, which was patently different from the approach that had been taken by the district court; the Supreme Court imposed no preconditions to resentencing.

The more interesting issues concern the district court's calculations of drug amounts. At the original pre-Booker sentencing, the district court had determined, in accordance with

the pre-sentence report, the specific amounts of cocaine that Thomas had supplied to Ash during the period of the conspiracy including a seizure at Ash's arrest, all of which Thomas said had been secured from Fanfan.

To this the court added, as relevant conduct, the additional powder cocaine and crack cocaine seized from Fanfan at the time of his arrest. Using the formula that treats crack cocaine in a 100-to-1 ratio in relation to powder cocaine, the powder cocaine and crack cocaine together corresponded to an offense level of 34. Two more levels were added because Fanfan was regarded as an organizer, leader or manager in a conspiracy. U.S.S.G. § 3B1.1(c) (2003).

A sentencing court must make a reasonable determination of drug quantity, United States v. Ventura, 353 F.3d 84, 87 (1st Cir. 2003), cert. denied, 541 U.S. 980 (2004), but Fanfan suggests no plausible basis for disputing the calculations of the amounts of powder cocaine and crack cocaine attributed to him. Fanfan suggests that regardless of the drug quantity attributable to the conspiracy, he was entitled to a determination of the amount of drugs fairly foreseeable as to him. The short answer is that Ash said he got all his drugs from Thomas and Thomas said he got all of his from Fanfan. See United States v. Colon-Solis, 354 F.3d 101, 103 (1st Cir. 2004).

-11-

Fanfan does not dispute the amounts seized from him on his arrest, but he does object to the other amounts estimated during the life of the conspiracy. The PSR was reasonable in estimating the 1.25 kilograms of cocaine powder for which Fanfan was responsible. The probation officer used Ash's estimates of the amount he sold to Smith as the amount attributable to Fanfan (because Thomas was Ash's only supplier, and Fanfan Thomas' only supplier). The probation officer did not "average" the amounts based on the most and least sold in a transaction, see United States v. Sepulveda, 15 F.3d 1161, 1196-99 (1st Cir. 1993), cert. denied, 512 U.S. 1223 (1994), but instead reasonably used Ash's estimates of per week sales and number of weeks at that level.

Fanfan next says that there is no proof that what the district court found to be 281 grams of crack cocaine was crack cocaine rather than cocaine base. As United States v. Robinson, 144 F.3d 104, 109 (1st Cir. 1998), explains, crack cocaine is a form of cocaine base that is prepared for smoking and is chemically identical to other forms of cocaine base, such as the paste from which ordinary powder cocaine is produced. Under the guidelines, the "crack" form of cocaine base is subject to greater penalties. Id.

In this case Thomas ordered crack from Fanfan in the final transaction, and both a local officer and a federal agent identified the seized substance as crack cocaine based upon its

appearance; typically, crack cocaine has a yellowish, rock-like appearance.  The district judge's findings are tested for clear error, Robinson, 144 F.3d at 109, and the district court did not err at all--let alone clearly err--by saying that the substance was crack cocaine.  We have previously held that "[l]ay opinion testimony suffices to prove that a substance is crack."  United States v. Richardson, 225 F.3d 46, 50 (1st Cir. 2000), cert. denied, 531 U.S. 1203 (2001).

Although (given the government's concession) the crack cocaine was not formally part of the "conspiracy," the guidelines required its consideration in sentencing if it was part of the same course of conduct.  U.S.S.G. § 1B1.3(a) (2003).  The crack cocaine was ordered by Thomas along with powder cocaine in the same manner as he ordinarily ordered drugs from Fanfan; Fanfan delivered the crack cocaine at the same time as the powder cocaine; and both events occurred in very close proximity to the conspiracy whose termination (by Thomas' arrest) was unknown to Fanfan.

Drug dealers often supply both powder and crack cocaine depending upon what is ordered.  Whether or not Thomas had previously ordered crack cocaine, Fanfan supplied it without hesitation for this final transaction.[2]  Under the guidelines and

---

[2] The transcript of the conversation in which Thomas ordered the crack cocaine from Fanfan reveals no hesitation.  Thomas said "I wanna something hard too," to which Fanfan replied:  "Oh okay."  When Thomas asked, "Can you um, I mean can you work with that, you gonna hook me up?" Fanfan replied, "Yeah, I mean I wanna yeah."

precedents, the crack was easily labeled as part of the same course of conduct, U.S.S.G. §1B1.3 n.9; United States v. Barbour, 393 F.3d 82, 92 (1st Cir. 2004), cert. denied, 126 S. Ct. 212 (2005); and assuredly there was no clear error in the trial court's assessment. Id. at 92; see also United States v. Moore, 130 F.3d 1414, 1418-19 (10th Cir. 1997).

In the course of attributing the seized crack to Fanfan, the district judge referred briefly to an earlier statement by the federal agent; that agent had reported Thomas as admitting that he had ordered crack from Fanfan during the conspiracy itself. Fanfan says that he should have been allowed an evidentiary hearing to cross-examine the agent about his statement and to cross-examine Thomas in view of the fact that Thomas had not stated at trial that he had ever purchased crack cocaine from Fanfan.

At sentencing, the district court is not directly bound by ordinary rules of evidence and strict confrontation rules do not apply, U.S.S.G. § 6A1.3; United States v. Lizardo, 445 F.3d 73, 88 (1st Cir. 2006), cert. denied, 2006 WL 2725918 (Oct. 30, 2006), but under some circumstances considerations of fairness and utility might require an evidentiary hearing to resolve a critical issue of fact. United States v. Rodriguez, 336 F.3d 67, 70 (1st Cir. 2003). This is not such an instance: in the present case, the crack cocaine was unquestionably part of the same course of dealing,

whether or not Thomas had purchased crack during the conspiracy itself.

Moving to issues that are largely legal in character, Fanfan says that the 100-to-1 ratio overstates the significance of crack cocaine; but this is effectively a legal determination by Congress and not one that a court may disregard. United States v. Pho, 433 F.3d 53, 65 (1st Cir. 2006). Similarly, Fanfan's legal claim that the guideline determinations had to be made by a jury based on proof beyond a reasonable doubt has been rejected by the Supreme Court in Booker. Lizardo, 445 F.3d at 89.

The guideline calculations were not treated as determinative. The district court recognized that the guidelines were only advisory, although entitled to significant weight, United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006), and the judge addressed other factors and explained why he chose a sentence in the middle of the guideline range. Fanfan makes no showing that the outcome was unreasonable. United States v. Navedo-Concepción, 450 F.3d 54, 59 (1st Cir. 2006).

Finally, Fanfan argues that his sentence violates ex post facto principles because the sentencing regime was changed to his disadvantage after his crime was committed. No ex post facto argument is available because Booker's changes were worked by judicial decision and not legislation; Fanfan can only argue a due process violation. We have discussed the relevant authority in

United States v. Lata, 415 F.3d 107 (1st Cir. 2005), and need not repeat the discussion.

Any due process claim would also fail. United States v. Pérez-Ruiz, 421 F.3d 11, 15 (1st Cir. 2005), cert. denied, 541 U.S. 1005 (2006). At the time Fanfan committed the crime, April 2003, he faced a statutory maximum of 40 years. This was prior to both Blakely and Booker, and the only cloud on a prosecutor's horizon was Apprendi, which dealt with statutory maximums. Apprendi, 530 U.S. at 489. Fanfan's sentence is not higher than could "realistically have been imagined." Lata, 415 F.3d at 112.

Finally, Fanfan says that the government improperly "manipulated" both the amount and the kind of drugs ordered in the final transaction in order to increase Fanfan's sentence. Almost every controlled buy has the potential to increase a sentence. United States v. Connell, 960 F.2d 191, 194 (1st Cir. 1992). The question is whether the government's conduct was "outrageous" or "intolerable" and rose to the level of "extraordinary misconduct." United States v. Montoya, 62 F.3d 1, 4 (1st Cir. 1995).

Here, no pressure (e.g., threats or pleas) was placed on Fanfan to supply the crack cocaine.[3] Thomas asked for crack cocaine, and it was readily and immediately supplied. Nor is this

---

[3] Cf. United States v. Jacobson, 503 U.S. 540, 550 (1992); Sherman v. United States, 356 U.S. 369, 373 (1958); United States v. Gamache, 156 F.3d 1, 11-12 (1st Cir. 1998); United States v. Brooks, 215 F.3d 842, 846 (8th Cir. 2000).

a case where the government provided opportunities for successive escalating crimes as part of a sting operation.  Cf. Connell, 960 F.2d at 194.  Whether or not Fanfan had previously sold crack to Thomas, he obviously had a source of supply and a willingness to deal in it, and Fanfan has shown no overreaching by the government, let alone extraordinary misconduct.  Montoya, 62 F.3d at 4.

There are other scattered references to guideline errors, but we have addressed all that appear significant.  That the new sentence is much longer than the old proves nothing; the old one was constrained by a view of sentencing law from which the Supreme Court has retreated.  That the sentence is quite long is a result of determinations made by Congress, which we are not free to ignore.

Affirmed.